UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CRC INSURANCE SERVICES, INC.,  :          Case No. 22-cv-9528

                Plaintiff,  :

                   :

       -against-  :          **COMPLAINT**

JAMES SUH,  :

             Defendant.  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

     CRC Insurance Services, Inc. ("CRC" or the "Company"), by and through its attorneys Ogletree, Deakins, Nash, Smoak & Stewart, P.C., brings this complaint against James Suh ("Suh" or "Defendant"), alleging as follows:

## NATURE OF THE ACTION

     1.    This is an action for breach of contract, misappropriation of confidential information and trade secrets, tortious interference with business relations, conversion, attorneys' fees, and injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure ("FRCP"), arising out of Suh's refusal to honor the terms and conditions of his non-solicitation and non-disclosure agreements with CRC.

## PARTIES

     2.    CRC is an Alabama corporation with its principal place of business in Birmingham, Alabama. CRC maintains its New York offices at 1325 Avenue of the Americas, New York, New York 10019.

     3.    On April 2, 2012, CRC acquired all the stock (the "Stock Purchase") of the parent of Crump Insurance Services, Inc. ("Crump"), and on April 1, 2013, Crump was merged into CRC.

     4.    Upon information and belief, Suh is an individual with a residence at 6019 S. Olathe Street, Aurora, CO 80016.

## JURISDICTION AND VENUE

5.     This Court has personal jurisdiction over Suh because on August 22, 2011, Suh executed a Confidentiality and Non-Solicitation Agreement (the "Suh Agreement" or "Agreement") with Crump.  The Suh Agreement provided that "any action or proceeding with respect to [the Suh Agreement] shall be brought in… the United States District Court for the Southern District of New York… and the parties agree to the jurisdiction thereof."  (Exhibit A, ¶11).

6.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1). There is complete diversity of the parties, as Suh is citizen of the state of Colorado and CRC is a citizen of the state of Alabama.  The amount in controversy exceeds $75,000, as Suh's continued improper solicitation of accounts absent an injunction is expected to result in approximately $950,000 of lost revenue to CRC annually.

7.     Venue is proper in this Court pursuant to the forum selection clause in the Suh Agreement. (Ex. A, ¶11).

## FACTS

### CRC's Business

8.     For more than 30 years, CRC has delivered exceptional expertise and service to the commercial insurance marketplace.  As a wholesale insurance broker, CRC does not work directly with insured entities.  Rather, CRC serves as a key intermediary between retail insurance agents and insurance carriers.  CRC's customers are retail insurance agents and brokers.

9.     A wholesale insurance broker acts as an intermediary between retail insurance agents and insurance carriers.  In other words, CRC's "product" is that intermediary connection that its brokers provide.  For example, a retail insurance agent may not be able to obtain

insurance coverage for an insured because the type of risk is outside the retail agent's area of expertise or because the retail agent does not have access to particular insurance carriers. Wholesale brokers provide a valuable service to retail insurance agents and insureds by providing access to insurance carriers who underwrite certain types of insurance that the retail agent might otherwise not be able to obtain.  In such cases a CRC broker, for example, would contact insurance carriers with whom CRC maintains relationships in order to obtain an insurance policy for a retail broker that provides the amount and type of coverage needed by the insured.  In so doing, CRC effectively matches the insured's need for coverage with the carrier that provides the desired coverage.

10.    The intermediary connection that is CRC's product is forged from a combination of several components: the training CRC provides to its brokers, the relationships CRC fosters and pays its brokers to develop, and the historical data of past deals done.  Over many years, CRC has invested time, large amounts of money, and effort in developing its confidential and commercially valuable information which is at the core of each of these components, which information is collectively referred to herein as "CRC Confidential and Proprietary Trade Secret Information."  CRC Confidential and Proprietary Trade Secret Information includes, but is not limited to:

    a.  Lists of customers and prospective customers, including special customer matters like their interest, needs, particular retail agent specialties, insured needs, risk factors applicable to particular insureds and industries, insurance program structures, renewal and expiration data, customers concerns and key contacts;

    b.  Highly sensitive account details regarding particular CRC customers and accounts, including commission fee structures, customer file documents, business records, pricing information and sales plans;

    c.  CRC financial matters, including pricing, profit margins, commissions and/or fees;

    d.  Business, management and operational strategies and procedures;

e.  Structure and pricing of insurance programs that CRC has negotiated with particular underwriters and/or developed for particular industries; and

f.  Selective personnel information and data, including compensation structure, employees' performances, in particular the relative performance of its brokers and inside brokers, employees' strengths and weaknesses, assigned customer accounts, and related employee information.

11.  CRC Confidential and Proprietary Trade Secret Information has independent economic value because it is not known either to CRC's competitors or generally within the commercial insurance brokerage industry. CRC Confidential and Proprietary Trade Secret Information has been developed by CRC and is used by CRC for the purpose of developing and training its employees and allowing them to effectively and efficiently market, sell, deliver and manage insurance products and its services.  CRC also provides its brokers with the strength of its 30-year reputation and goodwill in the industry, as well as CRC's back-office operations to provide the customer service to support that reputation.

12.  CRC's business success depends, in large measure, upon the skill of its brokers and the personal relationships that its brokers develop in the marketplace using CRC Confidential and Proprietary Trade Secret Information, CRC's expense accounts and training. CRC dedicates substantial monies, personnel hours and other resources to the creation and development of the relationships that are critical to CRC securing and conducting business as a wholesale broker — relationships with retail agents, insurance carriers, and others.  For example, except during periods of public health emergency due to COVID-19, CRC pays for its brokers to entertain retail brokers, with golf outings, trips, concerts, ball games, dinners and the like, in order to build relationships, engender trust, and learn a b o u t  CRC's retail brokers' needs to be able to support them in the business. Key to those relationships is the discovery, retention and use of information about CRC's clients and accounts, the insurance carriers with whom

CRC's brokers interact on behalf of retail brokers, account details and information provided during transactions, insurance market specifics, and a vast panoply of other information that is found in CRC Confidential and Proprietary Trade Secret Information. CRC provides its employees with access to CRC Confidential and Proprietary Trade Secret Information, and expends significant time and resources training its brokers to use its contents and to conduct business at the highest levels of integrity and performance. The relationships that CRC has paid millions of dollars to develop, as well as the information that is harvested in and from those relationships, are of the utmost importance to CRC's success.

13.    CRC has invested substantial time, money, and effort developing its trade secrets, know-how, and proprietary information, including, but not limited to, information technology products, processes and techniques, software and tools, confidential account and prospective account information, confidential information regarding retail brokers and carriers, company sales reports, analyses, marketing plans, research and account development plans, pricing strategies and business methods, specially negotiated terms with retail agents and on behalf of accounts for insureds, contractor relationships and identities, and other confidential information, and establishing its reputation and goodwill.

14.    By investing substantial time and money in the development of personal relationships, and facilitating the continued development of these relationships, CRC builds goodwill with retail insurance brokers, understands their respective needs, and is able to serve their interests more directly and completely.

15.    CRC has gone to significant lengths to protect its CRC Confidential and Proprietary Trade Secret Information. Specifically, CRC stores and maintains such information via a highly secure computer system, access to which requires a password, and is restricted to

Company employees. The building in which CRC's servers are maintained is secured with appropriate locks and other access control devices.

16. CRC also maintains a comprehensive data security plan, and imposes numerous employee controls to ensure that its trade secrets and confidential information are not provided to non-employees.

17. To further protect its trade secrets and confidential information, and to leave no doubt as to employees' post-employment obligations regarding the same, CRC also requires that certain of its employees to sign Confidentiality and Non-Solicitation Agreements as a condition of their employment with CRC.

**Suh's Confidentiality and Non-Solicitation Agreement**

18. On August 22, 2011, Suh signed the Suh Agreement.

19. The Suh Agreement contains explicit terms regarding Suh's obligations with respect to trade secrets and confidential information, as well as non-competition and non-solicitation provisions governing Suh's post-employment obligations.

20. By signing the Suh Agreement, Suh acknowledged that:

> The Company's involvement in the wholesale insurance business has required and continues to require the expenditure of substantial amounts of money and the use of skills developed over a long period of time. As a result of these investments of money, skill and time, the Company has developed and will continue to develop certain valuable Trade Secrets and Confidential Information that are particular to the Company's business and the disclosure of which would cause the Company great and irreparable harm

Ex. A, ¶ 1(a).

21. Suh also acknowledged that, during his employment, he would be entrusted with access to "Trade Secrets" and "Confidential Information," as those terms are defined in the Suh Agreement, and expressly and voluntarily agreed that he would protect, treat as secret and

confidential, and would not disclose, divulge, or reveal any such information following his separation from the Company "without specific prior written authorization from the Chief Executive Officer of the Company."  Ex. A, ¶¶ 1(a), 1(d).

22.     "Confidential Information" and "Trade Secrets" are defined in the Suh Agreement as including, among other things, "customer and Account lists," "Customer and Account information, including but not limited to any compilations of past, existing or prospective customers or Accounts," "applications and records," "specific customer or Account needs and requirements," "policy expiration dates, policy terms and conditions and rates", "renewal information", "information regarding the [carriers] or sources with which insurance is placed" and "[c]ustomer and Account information, including but not limited to any compilations of past, existing or prospective customers or Accounts, customer or Account proposals or agreements between customers or Accounts and the Company, status of customer or Account balances or credits, or related information about actual or prospective customers or Accounts."  Ex. A, ¶ 1(b).

23.     Under the terms of the Suh Agreement, Suh also expressly and voluntarily agreed that:

> I understand that while employed by the Company, I will have contact with and become aware of Confidential Information and Trade Secrets regarding the Company's Accounts, including but not limited to the representatives of those Accounts, their names and addresses, specific Account needs and requirements, and leads and references to prospective Accounts. I further understand that loss of such Accounts will cause the Company great and irreparable harm. Therefore, I agree that for two (2) years after the end of my employment, whether such separation from employment is voluntary or involuntary, I will not directly or indirectly (i) solicit, attempt to solicit, or assist others in soliciting or attempting to solicit or accept business from, or provide insurance services for or at the request of, any Account or prospective Account of the Company, or (ii) replace or attempt to replace the Company as the wholesale broker of record for any Account of the Company [except as

> permitted in subsection 3(b) of the Agreement, which subsection is
> not pertinent to the events at issue in this action].

Ex. A, ¶ 3(a).

24.     Under the terms of the Suh Agreement, Suh also expressly and voluntarily agreed

that:

> for as long as I am employed by the Company, I will not solicit,
> recruit, induce away or hire, or attempt to solicit, recruit, induce
> away or hire, whether directly or indirectly or by assisting others,
> any other employee of the Company with whom I had contact or
> about whom I learned Confidential Information or Trade Secrets
> during my employment with the Company. Further, I agree that for
> two (2) years after the end of my employment I will not solicit,
> recruit, induce away or hire, or attempt to solicit, recruit, induce
> away or hire, directly, indirectly, or by assisting others, any other
> employee of the Company with whom I had contact or about whom
> I learned Confidential Information or Trade Secrets during my
> employment with the Company.

Ex. A, ¶ 4.

25.     Under the terms of the Suh Agreement, Suh also expressly and voluntarily agreed

that his violation of the restrictive covenants in the Suh Agreement "may cause the Company great

and irreparable harm." Ex. A, ¶ 5(b).

26.     Suh further agreed that, if he breached the restrictive covenants in the Suh

Agreement, he "consent[ed] to the entry of an appropriate permanent injunction in a Court of

appropriate jurisdiction and hereinafter named." *Id.*

27.     Suh further agreed that in the event he breached Section 3 of the Suh Agreement,

he would be liable for, in addition to other available remedies, liquidated damages in the amount

of 200% of the gross commissions and fees received by CRC during the final 12 months of Suh's

employment, from each account lost due to his breach. *Id.* ¶5(c).

28.     Suh further agreed that, "I shall be obligated to reimburse the Company for all reasonable costs, expenses and counsel fees incurred by the Company in connection with the enforcement of its rights hereunder." *Id.*

29.     Suh also expressly and voluntarily agreed that:

> The parties, being desirous of having any disputes resolved in a forum having substantial body of law and experience with matters contained herein, agree that any action or proceeding with respect to this Agreement shall be brought in the Supreme Court of the State of New York, County of New York, or in the United States District Court for the Southern District of New York… and the parties agree to the jurisdiction thereof.

Ex. A, ¶ 11.

**The Non-Solicitation Provisions of the Agreements Expressly Prohibit Suh from Accepting or Servicing Business from CRC Clients and from Replacing CRC as the Broker of Record on CRC Accounts**

30.     The non-solicitation provision in the Suh Agreement expressly prohibits him from accepting business from or providing insurance services for or at the request of any Account for a specified period of time following his employment with the Company.  *See* Ex. A, ¶ 3(a).

31.     The non-solicitation provision in the Suh Agreement also expressly prohibits him from replacing or attempting to replace the Company as the wholesale broker of record for the Company Accounts for a specified period of time following his employment with the Company. *See* Ex. A, ¶ 3(a).

32.     Suh's express agreement to refrain from the above-referenced conduct for a specified period of time following his employment with the Company constitutes a limited non-compete agreement that is enforceable under New York State law.

**CRC Purchases Crump's Stock and Succeeds Crump in Connection with Its Rights and Obligations Under the Agreement**

33.     Pursuant to the Stock Purchase, CRC, by operation of law, became the owner of

9

Crump's assets, including its business operations, customer relationships and agreements, and goodwill.

34.     CRC also succeeded Crump in connection with its rights and obligations under various agreements, including the Suh Agreement.

### Suh's Employment with CRC

35.     Simultaneous with and as part of the Stock Purchase, Suh became a CRC insurance broker based at CRC's Denver, Colorado location.

36.     Suh worked for many years under the terms of the Agreement, in exchange for pay from CRC.

37.     CRC performed all of its obligations under the Agreement during the period of Suh's employment with CRC.

### While Employed by CRC, Suh Serviced CRC's Customers and Had Access to CRC Confidential and Proprietary Trade Secret Information

38.     CRC's customer and Account lists are the lifeblood of its business, and its relationships with retail brokers are one of its most valuable assets.

39.     During his employment with CRC, Suh had access to and utilized CRC Confidential and Proprietary Trade Secret Information, including CRC's customer and Account lists, and customer and Account names and contact information.

40.     CRC developed and cultivated the retail brokers it serviced at great expense and over a number of years.  CRC expends a significant amount of time, energy, and expense to cultivate and maintain retail broker relationships.   Accordingly, CRC incurs substantial expenditures to maintain these retail broker  relationships, including the money it spends every year for support staff, operations personnel, systems and support, management and compliance supervision, computer services and equipment, phones, mail, research, literature, seminars, trade

and other professional news publications, promotional events, the retention of experts in various specialties, and the many other expenditures CRC incurs in maintaining its goodwill in the industry and in compiling its customer and Account lists.  CRC also incurs significant expenditures in furtherance of its efforts to convert a prospective customer into a customer, including expenditures related to prospecting, marketing, travel, entertainment, and legal, compliance, and technology-related costs.

41.     Suh benefited directly from the goodwill, reputation, and name recognition generated by all of these expenditures and consequently maintained business relationships with customers on behalf of CRC and provided services to these customers, including placing Accounts with carriers.

42.     By June 2021, Suh's book of business generated approximately $950,000 in annual revenue for CRC.

**CRC Aggressively Protects CRC Confidential
and Proprietary Trade Secret Information**

43.     CRC Confidential and Proprietary Trade Secret Information is not readily ascertainable outside of CRC and would not have been known to Suh but for his employment with CRC.

44.     CRC's customer and Account lists and related information, in particular, were assembled over many years to service its customers and Accounts, and cannot be readily duplicated.  Indeed, it would be very difficult, expensive, and time-consuming for a competitor to duplicate a similar body of information from scratch.

45.     The ability to use specific carriers is valuable and irreplaceable.

46.     The prices that CRC obtains from its suppliers, the insurance carriers, are equally valuable and irreplaceable.  Those prices are a product of CRC's extensive efforts to build

relationships with insurance carriers, and negotiate the most favorable pricing terms possible for CRC's clients.

47.     Accordingly, this confidential information, if known to CRC's competitors, would confer a substantial value upon such competitors, and place CRC at a tremendous competitive disadvantage.  For example, if CRC's competitors had knowledge of the prices that CRC has obtained from certain insurance carriers, those competitors could use that knowledge to negotiate better pricing terms for themselves – thus robbing CRC of a valuable competitive advantage that it acquired over several years, and at a tremendous expense.

48.     Knowledge of the expiration and renewal dates for the policies placed by CRC's for the Accounts, and knowledge of the carriers where the insurance for the Accounts was placed is also of significant worth to a competitor.  For example, a competitor could use this information to get a renewal quote on a policy from an incumbent carrier and block CRC from getting a quote from that incumbent carrier on its Account.

49.     CRC maintains the CRC Confidential and Proprietary Trade Secret Information in the strictest confidence through the use of rigorous procedures designed to ensure that confidentiality is maintained.

50.     CRC limits access to CRC Confidential and Proprietary Trade Secret Information through the use of password protections for the computer databases that store it.  The information can only be accessed via CRC's secure, password-protected corporate network.

51.     Altogether, CRC takes numerous measures to preserve the confidentiality of the CRC Confidential and Proprietary Trade Secret Information, including, but not limited to, the following:

    a.  limiting the disclosure of CRC Confidential and Proprietary Trade Secret Information only on a need-to-know basis;

b.  implementing strong personnel policies that each employee acknowledges and promises to adhere to;

c.  conducting regular training on confidentiality and safeguarding customer information;

d.  distributing Code of Conduct manuals;

e.  requiring CRC employees to sign confidentiality and non-disclosure agreements before receiving access to CRC Confidential and Proprietary Trade Secret Information; and

f.  maintaining CRC Confidential and Proprietary Trade Secret Information on password-protected databases and in other secure areas.

**Suh's Abrupt Resignation to Join a Direct Competitor and Breaches of His Contractual and Other Duties to CRC**

52.   On June 7, 2021, Suh abruptly resigned from CRC to begin working as a broker for R-T Specialty, LLC ("RT").

53.   RT is a direct and substantial competitor of CRC.

54.   Between June 7, 2021, and June 9, 2021, both members of Suh's support staff – Debbie Rampy and Karen Linder – also abruptly resigned from CRC to commence employment with RT.

55.   Suh admitted to CRC that he provided RT's phone number to Ms. Rampy and Ms. Linder, for the purpose of them discussing employment with RT.

56.   Ms. Rampy and Ms. Linder were hired within an hour of calling and talking to, Edward F. McCormack, the President and General Counsel of RT.

57.   Suh improperly solicited Ms. Rampy and Ms. Linder to terminate their employment with CRC to work for RT.

58.   Moreover, prior to his departure from CRC, Suh improperly deleted all information from his CRC cell phone and restored it to factory settings before returning it to CRC.

59.     Suh breached and continues to breach his contractual and other duties owed to CRC.

60.     Suh's breaches of his contractual and other duties owed to CRC are for his own benefit, and to the detriment of CRC.

61.     Suh's position with RT is substantially similar, if not identical, to the position he held at CRC, and involves a substantially similar, if not identical, customer base.

62.     Upon his arrival at RT, Suh solicited customers of CRC whom he actively solicited, developed, and secured during his employment with CRC for the CRC Accounts.  Ms. Rampy and Ms. Linder, respectively, also solicited such customers on Suh's behalf (the "indirect solicitation").

63.     Within several weeks after Suh resigned from CRC to join RT, CRC began to receive notices of Broker of Record ("BOR") letters from insurance carriers advising that certain CRC Accounts were switching their broker from CRC to RT.

64.     An insured can change its wholesale insurance broker two ways:  (i) at renewal the retail broker can begin using a new wholesale broker who places insurance through a different carrier than the one the insured is currently using or (ii) at renewal or midway through the term of the policy the retail broker notifies the incumbent insurance carrier of its decision to change its wholesale broker through a BOR, and notifies it of the identity of its replacement.  The insurance carrier then sends a notice, which formally advises the incumbent wholesale broker that it will no longer be serving as the insured entity's wholesale insurance broker.  In the ordinary course of its business, CRC receives notices of BOR letters infrequently.

65.     CRC has received emails sent in error indicating that Suh's team at RT had begun requesting quotes for policy renewals for accounts which Suh had been responsible for servicing at the time of his resignation from CRC.  In some cases, because Suh and his team knew the

incumbent carrier and the expiration date they have blocked CRC from being able to get quotes from the incumbent carriers on their accounts.

66.     CRC has reason to believe that at least seventy (70) accounts that Suh serviced for CRC at the time of his resignation have switched to RT and/or have been actively solicited by Suh's team to switch to RT.

67.     CRC has also received emails sent in error indicating that Suh has serviced accounts for RT that he serviced for CRC at the time of his resignation.

68.     BOR letters that CRC received following Suh's resignation also evidenced the indirect solicitation, as such letters bore Ms. Rampy's name instead of Suh's, despite the fact that solicitation fell within the scope of Suh's role at RT, but outside the scope of Ms. Rampy's, and they were a team at RT.

69.     Suh's violations are ongoing and continuing.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract)

70.     CRC repeats and realleges each and every allegation set forth in paragraphs 1 through 69 as though fully set forth herein.

71.     As previously described herein, on August 22, 2011, Suh entered into the Suh Agreement with Crump.

72.      CRC assumed Crump's rights and obligations under the Agreement, respectively, when it acquired Crump.

73.     Suh breached the Agreement by directly and/or indirectly soliciting and servicing customers belonging to CRC for his personal benefit and for the benefit of RT; and directly and/or indirectly soliciting his support staff to leave CRC to work for RT.

74.     CRC duly performed all of its obligations under the Agreement.

75.     As a direct and proximate result of Suh's misconduct, CRC has suffered and continues to suffer substantial money damages.

## SECOND CLAIM FOR RELIEF

### (Misappropriation of Trade Secrets and Confidential Information)

76.     CRC repeats and realleges each and every allegation set forth in paragraphs 1 through 75 as though fully set forth herein.

77.     CRC has expended significant time and expense to develop and safeguard the CRC Confidential and Proprietary Trade Secret Information. The CRC Confidential and Proprietary Trade Secret Information has been developed with a substantial amount of effort and investment and cannot lawfully be acquired or duplicated by others. Further, such information is valuable to CRC as it gives it a competitive advantage and thus would be valuable to CRC's competitors. The CRC Confidential and Proprietary Trade Secret Information is not known outside of CRC's business, is only known by employees and others involved in CRC's business, and is subject to measures to guard its secrecy.

78.     Suh agreed that CRC Confidential and Proprietary Trade Secret Information was protectable and that he has a continuing duty to protect such information from misuse or disclosure.

79.     Upon information and belief, Suh has knowingly misused and/or misappropriated CRC Confidential and Proprietary Trade Secret Information, in violation of his contractual obligations to CRC, and for his benefit. Upon information and belief, this misuse and misappropriation includes, but is not limited to, his efforts to take, share, and use the CRC Confidential and Proprietary Trade Secret Information on behalf of RT.

80.     As a direct and proximate result of Suh's misconduct, CRC has suffered irreparable harm and will continue to suffer irreparable harm unless Suh is enjoined from engaging in any such further conduct.

81.     As a direct and proximate result of Suh's misconduct, CRC has and will continue to suffer substantial money damages.

## THIRD CLAIM FOR RELIEF

### (Unfair Competition)

82.     CRC repeats and realleges each and every allegation set forth in paragraphs 1 through 81 as though fully set forth herein.

83.     By his wrongful actions, Suh has knowingly misappropriated confidential and proprietary information belonging to CRC for use in RT's business and has engaged in unfair competition with CRC.

84.     By knowingly misappropriating CRC's confidential and proprietary information, Suh will receive and already has unfairly received the benefit of his wrongful exploitation and appropriation of the goodwill of CRC's customers to compete directly with CRC, without incurring the time, effort, and expense invested by CRC in acquiring and developing those business relationships.

85.     As a direct and proximate result of Suh's misconduct, CRC has suffered irreparable harm as a result and will continue to suffer irreparable harm unless Suh is enjoined from engaging in any such further conduct.

86.     As a direct and proximate result of Suh's misconduct, CRC has suffered and continues to suffer substantial money damages.

## FOURTH CLAIM FOR RELIEF

### (Tortious Interference with a Business Relationship)

87.     CRC repeats and realleges each and every allegation set forth in paragraphs 1 through 86 as though fully set forth herein.

88.     CRC had a business relationship with Accounts that Suh solicited from CRC customers.  Suh knew of CRC's business relationship and has intentionally and maliciously interfered with CRC's business relationships by, among other things, using CRC Confidential and Proprietary Trade Secret Information to induce CRC's customers to terminate their business relationship with CRC and transfer their accounts to RT.  Suh knew and intended that this conduct would harm CRC.

89.     CRC had a business relationship with the CRC employees whom Suh solicited to work for RT.  Suh knew of CRC's business relationship and intentionally and maliciously interfered with CRC's business relationships by, among other things, inducing the employees to terminate their employment with CRC and transfer to RT.  Suh knew and intended that this conduct would harm CRC as he was taking his entire team with him to RT.

90.     As a direct and proximate result of the foregoing, CRC has suffered and will continue to suffer non-compensable financial loss.

91.     As a direct and proximate result of the foregoing, CRC has suffered and will continue to suffer substantial money damages.

## FIFTH CLAIM FOR RELIEF

### (Conversion)

92.     CRC repeats and realleges each and every allegation set forth in paragraphs 1 through 91 as though fully set forth herein.

93.     CRC Confidential and Proprietary Trade Secret Information, including its customer lists, and customer names and contact information, constitutes valuable property belonging to CRC.

94.     Suh has used and converted for his own benefit the property belonging to CRC to the exclusion of CRC's rights.

95.     As a direct and proximate result of Suh's misconduct, CRC has been greatly damaged.  CRC has suffered irreparable harm as a result of Suh's conduct and will continue to suffer irreparable harm unless they are enjoined from engaging in any such further conduct.

96.     As a direct and proximate result of Suh's misconduct, CRC has suffered and continues to suffer substantial money damages.

<u>**SIXTH CLAIM FOR RELIEF**</u>

**(Indemnification/Attorneys' Fees and Costs)**

97.     CRC repeats and realleges the allegations contained in paragraphs 1 through 96 above as though fully set forth herein.

98.     Pursuant to paragraph 5(c) of the Suh Agreement, Suh agreed that he "shall be obligated to reimburse the Company for all reasonable costs, expenses and counsel fees incurred by the Company in connection with the enforcement of its rights hereunder."  Ex. A, ¶ 5(c).

99.     Suh's breaches of the terms and obligations of the Suh Agreement entitle CRC to recover its attorneys' fees and costs incurred as a result of such breaches.

<u>**SEVENTH CLAIM FOR RELIEF**</u>

**(Injunctive Relief)**

100.    CRC repeats and realleges the allegations contained in paragraphs 1 through 99 above as though fully set forth herein.

101.    CRC seeks injunctive relief to prevent the continuing harm stemming from Suh's continued violations of CRC's contractual and other rights.

102.    In the Suh Agreement, Suh acknowledged that any violation of the Agreement would cause CRC irreparable harm.  Ex. A, ¶ 5(b).

103.    Suh furthered agreed that, upon breach of the Agreement, CRC would be entitled to, among other relief, "the entry of an appropriate permanent injunction" restraining him from violating the Agreement without being required to prove damages.  Ex. A, ¶ 5(b).

104.    Suh's actions have caused, and unless restrained will continue to cause, CRC severe, immediate and irreparable injury for which CRC has no adequate remedy at law.

105.    Absent injunctive relief, CRC will suffer monetary damages exceeding $75,000.

106.    As a result of Suh's continuing violations of CRC's contractual and other rights, CRC is entitled to injunctive relief restraining Suh from further violations, as well as money damages as a result of such violations and other equitable and legal relief.

## DEMAND FOR RELIEF

WHEREFORE, CRC demands judgment against Suh as follows:

A.    Granting a permanent injunction to prevent the Suh from violating the terms and conditions of the Suh Agreement;

B.    Ordering Suh to comply with the non-solicitation provisions of the Suh Agreement for a period of two (2) years from the date of the Court's Order;

C.    Ordering Suh to return to CRC any and all CRC Confidential and Proprietary Trade Secret Information or any other business information, records or documents containing CRC Confidential and Proprietary Trade Secret Information including, but not limited to, its customer lists;

D.     Awarding compensatory damages in favor of CRC for Suh's violations of the Suh Agreement;

E.     Awarding compensatory damages in favor of CRC for Suh's misappropriation of CRC Confidential and Proprietary Trade Secret Information;

F.     Awarding liquidated damages pursuant to Section 5(c) of the Suh Agreement for each Account that CRC lost due to Suh's breaches of the Suh Agreement;

G.     Awarding compensatory and consequential damages in favor of CRC, including but not limited to an amount equal to its present and future lost business opportunities, lost goodwill, and lost market share, in an amount to be determined;

H.     Awarding punitive damages in favor of CRC, together with all other monetary damages permitted by law, in an amount to be determined;

I.     Awarding CRC its reasonable attorneys' fees and costs, and pre-judgment and post-judgment interest; and

J.     Granting such other and further relief as the Court may deem just and proper.

Dated: New York, New York
       November 8, 2022

                              OGLETREE, DEAKINS, NASH,
                                SMOAK & STEWART, P.C.


                              By:   s/ Evan B. Citron
                                  Evan B. Citron
                              599 Lexington Avenue, 17th Fl.
                              New York, New York 10022
                              (212) 492-2500
                              evan.citron@ogletree.com

                              *Attorneys for Plaintiff*
                              *CRC Insurance Services, Inc.*